Hughes, Appellant, *v.* Freeley et al.

Argued October 1, 1928. Before MOSCHZISKER, C. J., FRAZER, WALLING, SIMPSON, KEPHART, SADLER and SCHAFFER, JJ.

*William C. Alexander,* with him *Francis Shunk Brown,* for appellant.—The evidence was not sufficient to warrant the conclusion that the testatrix was of unsound mind: Keller v. Lawson, 261 Pa. 489; Tetlow's Est., 269 Pa. 486; Phillips's Est., 244 Pa. 35; Lawrence's Est., 286 Pa. 58; Wertheimer's Est., 286 Pa. 155; Lidstone's Est., 92 Pa. Superior Ct. 553; Hersperger's Est., 245 Pa. 569; Draper's Est., 215 Pa. 315; Snyder's Est., 279 Pa. 63; Miller's Est., 265 Pa. 315.

*Bryan A. Hermes,* with him *William J. MacCarter, Jr.,* for appellees, cited: Harden v. Hays, 9 Pa. 151; Egbert v. Egbert, 78 Pa. 326; Wilson v. Mitchell, 101 Pa. 495.

OPINION BY MR. JUSTICE FRAZER, November 26, 1928:
This appeal from refusal of the court below to grant plaintiff's motion for judgment n. o. v. brings before us but one question for determination; namely, does the evidence support the verdict of the jury that Mary F. Hughes, known as the wife of appellant, did not possess testamentary capacity to make the will here in dispute at the time of its execution? The controversy had its inception in an appeal from the decision of the register of wills admitting the writing to probate and praying the orphans' court to direct a citation to Thomas Hughes, reputed husband of decedent and named in the will as her executor and sole beneficiary, to show cause why the probate should not be set aside and an issue directed to the common pleas to try by jury the following questions of fact; (a) whether or not decedent was at the time of the execution of the will a person of sound mind; (b) whether the will was procured by undue influence practiced by Hughes and others, and (c) whether the writing was the will of decedent. The orphans' court, after hearing, refused to award an issue on the ground of testamentary capacity, and held the will was executed in accordance with the Wills Act of 1917, but awarded

an issue d. v. n. on the ground of undue influence and restraint. Exceptions by contestants to the failure of the court to include the questions excluded were dismissed and on appeal to this court, Hughes Est., 286 Pa. 466, we held that so much of the decree of the orphans' court as refused to award an issue to try all three of the questions be reversed and ordered that these three issues be submitted to a jury for determination. In accord with this ruling, the case was subsequently tried in the common pleas upon the issues thus directed and resulted in a verdict against contestants upon the question of the legal execution of the will and undue influence. But on the issue of testamentary capacity the jury reached the conclusion that decedent was not at the time of the execution of the will of sound mind and understanding and of sufficient capacity to make a valid will. A motion for judgment n. o. v. was overruled and this appeal followed.

The four assignments of error submitted are directed against rulings by the court on requests for charge and the rejection of the motion for judgment n. o. v. We need not pass on these specifically, since a discussion of them must be along the same lines as our consideration of the single issue before us, whether there was sufficient evidence to sustain the verdict of the jury.

The evidence in the record now before us is substantially the same as that presented at the time the case was here before, with the important addition of clarifying details as to the mental capacity of decedent and the manner in which the will was executed. We may say here at the start that there hangs over the entire affair of this will an air of things deliberately arranged to achieve a projected wrong purpose. Deceased was a widow, mother by her first husband of three children, contestants here. Appellant, Hughes, is her reputed second husband, having married her while he still had a lawful undivorced wife living and who by the terms of the will is made her executor and sole beneficiary. The

estate is of value, amounting to about $100,000, and while the parties on both sides are interested parties, Hughes, proponent, had been for years the idle sharer in the income, had first lived in meretricious relations with decedent, then a widow, and later established a semblance of legality for that relationship by marrying her while his lawful wife still lived. His subsequent divorce from this wife did not of course validate his marriage with decedent. It is perhaps true that they lived together in harmony, and when she was stricken with a fatal illness he was not remiss in securing attention for her. The fatal illness brought forth the will which the jury has found was executed by decedent when she was mentally incompetent to make a valid testament. The writing on its face shows it was signed with two "X" marks, minus any statement that they were marks made by Mrs. Hughes, with her name written in front of the marks by one of the attesting witnesses and with attestation made by two witnesses. It was drawn, as testified by Hughes himself, by a friend of his at his request and copied by the scrivener from a form found in a law book, with the necessary changes as to place and names. No directions or information, as Hughes and the scrivener testified, were given the latter as to what provisions should be set forth in the writing; no directions as to the character of the estate and its disposal were given him, and the only guidance he had, as he declared on the witness stand, was the impression Hughes gave him that decedent was childless, and he accordingly made Hughes the sole beneficiary and executor. The latter testified that he had the will prepared at the request of testatrix, but there is no evidence that she instructed him as to its provisions or that he advised her what its provisions would be. The instrument was written in lead pencil by the scrivener and the following day, the day before its execution, Hughes, without reading it, as he says, took it to the house of a friend and had it copied in typewriting. Except for the wholly doubtful

and entirely uncorroborated testimony of one of the attesting witnesses, Mrs. Ruppel, it was not at any time, before or after execution, read to or by decedent, and the testimony of Hughes himself establishes definitely that she was at no time apprised of its contents. It certainly was not read to her, explained to her or read by her at the time at which she is said to have signed the writing.

On June 29, 1925, decedent had become so seriously ill that Hughes called Dr. Kistler, the first of the two physicians who attended her. On June 30th Dr. Langton was summoned. Their evidence conflicts as to the nature of her illness and her mental and physical condition on June 30th, and on July 1st the date of the execution of the writing. It is contended by contestants that testatrix suffered two strokes of paralysis, one June 30th and the second July 1st, a short time after signing the will, and that as a result of the first stroke she was rendered helpless physically, unable to use her right arm and hand, that her right side was paralyzed and her mental faculties so shattered as to wholly incapacitate her from making a valid testament, continuing in that state until her death July 5th. Proponent claims that, although she was seriously ill, there was no stroke previous to the execution of the will, and that, while physically unable to write her name, the result of a fall from her bed, injuring her right arm, she was not mentally incapacitated at the time of executing the will. Dr. Kistler says he first attended her June 29th and then June 30th and July 1st, the latter visit being in the morning, about two hours before the will was signed. He diagnosed her sickness as kidney trouble, as acute nephritis. He says she spoke rationally to him. He testified as follows on direct examination: "A. I diagnosed it as acute nephritis. Q. Up to that time had there been any evidence of any stroke? A. Not to my knowledge...... Q. On June 30th when you were there was there any evidence of any paralysis or anything of

that sort at that time? A. Not that I could see. Q. When was the next day you were there? A. July 1st, about 9 to 9:30......Q. Was there any evidence up to that time of any stroke? A. Not that I could see; no, sir...... Q. Again I ask you, in your opinion, was she of sound, disposing mind and understanding, and capable of making a will at that time? A. Yes, sir." On cross-examination: "Q. Didn't she have a stroke? A. Not to my knowledge. Q. Do you know what she died of? A. I don't know, I wasn't there. Q. Cerebral hemorrhage; you found that out later? A. I heard that ...... Q. What is your opinion as to the cause of her death? A. My opinion is she didn't have a stroke. Q. Although she had? A. I don't know...... Q. Was she able to use her arm? A. She said she couldn't write."

Contrasted with that quite indefinite testimony is that of Dr. Langton, who was called by Hughes and who first saw the sick woman on the evening of June 30th and again on the morning of July 1st, about an hour before the execution of the will. He was asked in direct examination: "Q. What did you diagnose her condition as? A. Cerebral hemorrhage. Q. Did she have any indication of a stroke on the 30th? A. Yes, sir...... Q. You say she was unable to use her right arm or leg? A. Yes. Q. Did she have the power to lift the right arm? A. No...... Q. Were you able to carry on any conversation with her on July 1st? A. No, sir. Q. On neither one of your visits July 1st were you able to carry on any conversation with her? A. No, sir. Q. Was she in your medical judgment, on July 1st when you saw her, of sound and disposing mind, memory and understanding? A. No. Q. Was she competent or able to understand the nature of a will or any contract? A. I don't think so; no, sir." On cross-examination: "Q. And you diagnosed her case when you first saw her as what? A. Cerebral hemorrhage. Q. What condition did you find her in, how was she suffering? A. More or less

comatose...... Q. And by 'comatose' you mean what? A. Unable to comprehend what I was saying to her, or respond...... Q. You say she was in a comatose state? A. Yes, sir. Q. By that you mean an unconscious state? A. Yes, sir...... Q. Did she talk to you? A. There was no response, no intelligent response."

Corroborative in extreme detail of Dr. Langton's testimony is that of Father Moore, a priest summoned to Mrs. Hughes's bedside. His first visit was on the morning of June 30th, the day before the signing of the will. He testified at much length, and with respect to his first call said: "She was in a very helpless condition and I began my work of preparing her for the purpose of my duty in calling there—the reception of the sacraments of our church. In my conversations with her I could not get any coherent answers." She had, as he further testified, no sense of feeling in her right arm and her entire right side and leg where in the same condition." As to his second visit he testified: "I found her July 1st in a worse condition than I found her June 30th." His testimony continues: "Q. Relate the conversation you had, if any, with her July 1st? A. She was incoherent; she couldn't make a response. Q. Couldn't she answer questions intelligently put to her by you? A. No, sir. During my questions, which were as I said before, of a spiritual nature, when I asked her questions she seemed to be in a lethargic state as if she was going into a coma and I couldn't get any proper responses to my questions. ...... Q. Was she able to make a confession to you on any of the subsequent days until she died, between June 30th and the time she died? A None whatever...... Q. Based on your judgment as a priest for upwards of 25 years and your experience in visiting sick people, on your observation of this lady at the time you visited her, particularly July 1st, was she on July 1st of sound, disposing mind, memory and understanding? A. She was not when I visited her at half past twelve July 1st." On cross-examination: "Q. What do you mean by 'No

intelligent response'?  A. She would pay no attention for half a minute and then possibly I would ask her another question and she might jerk back and answer the next one in a peculiar, untelligent or meaningless way."

We have thus, positive, precise and in detail, the testimony of Dr. Langton to the effect that on the day prior to the execution of the will decedent was suffering from cerebral hemorrhage, that her condition showed that she had already been stricken, that her right arm and side were paralyzed, that she lay in a state of coma and semicoma, that there were no intelligent responses to his questions; that he again saw her in the evening of July 1st, after the signing of the will on that day; that she was then mentally incapable of conversing, and that, in his opinion, neither on June 30th nor on July 1st, was she mentally competent to understand the nature of a will.  The testimony of Father Moore is of similar character and even more impressively conclusive.  It was his desire and duty, as her spiritual confessor, to arouse all the strength of her intellectual faculties to show her mind and whether she understood his questions.  But the clouded mind was not responsive, her mental faculties were permanently shattered and remained so until her death; and it was his opinion, as he testified, that she was mentally incompetent to make a will.  Against the direct and positive testimony of these two witnesses is that of Dr. Kistler.  But his is plainly a different kind of evidence.  His replies are indirect, confusing, evasive.  His testimony that she answered his questions intelligently is not conclusive. He was unable to say whether or not she had at any time suffered a stroke but did not say there was no stroke.  He did not see evidences of paralysis, but did not say there was no paralysis.  At one point he said the sick woman "could" write; a few questions further on he testified she said "she couldn't write with the arm," and he was of opinion that she was mentally capable of making a will.  Clearly his evidence does not balance,

much less outweigh, that of the emphatic and positive testimony of the other physician and of the Reverend Mr. Moore. In all their testimony as to the nature of the sickness of decedent and her physical and mental decrepitude they were certain, clear and positive, while that of Dr. Kistler is uncertain and evasive. Giving just weight to all his testimony, we cannot accept it as at all lessening the conclusiveness of that of the other two, both certainly as disinterested as he could possibly be. That the woman suffered a stroke previous to the execution of the will is also shown by the frank testimony of Mrs. Beck, a neighbor of the Hugheses. This witness while standing on the porch with Hughes on June 30th heard a fall within his house. Investigation developed that the sick woman had fallen to the floor in her bedroom. Hughes picked her up and placed her on the bed. She tried to speak, but only mumbled some words and her tongue "seemed to be very thick." But she could still answer "No" when asked if she wanted a doctor. Mrs. Beck returned to the house in the evening, but Hughes refused to let her see the sick woman. Hughes explained to others that she had fallen out of bed, had hurt herself and that there were black and blue marks on her arm. But neither of the physicians testified as to such marks. Mrs. Beck, however, again saw decedent on the afternoon of July 1st, after the signing of the writing, but the sick woman did not recognize her, and her opinion was that she was not of sound mind and understanding.

If more were needed to convince us that decedent was broken down mentally and physically, helpless in brain and body, when the will was executed, an examination of the testimony of Hughes and his two witnesses to the execution of the instrument, Mrs. Ruppel and Mrs. Kunkel, as to the manner in which that transaction was conducted, adds to the conviction that decedent was then mentally incompetent. These two witnesses were particular friends of Hughes, the former to such extent that

her husband had previously forbidden Hughes to come to his house because of the intimate relations between the two. Hughes and these two women were the only persons present at the signing, and from their own testimony we learn of the utter mental and physical helplessness of decedent at that time. They propped her up on the bed with pillows, laid a pillow before her on which they placed a scratch pad of paper. Hughes produced the will, but it was not read or explained to her, and there is no reliable evidence that it had ever been read or explained to her before that time. As the three stood around her she was not asked a single question about the will and she spoke no word concerning its provisions or about the signing of it. They placed a pen in her hand and endeavored to have her write her name on the pad. She is said to have succeeded in forming a single letter and no more; and then, as they testify, she said, "Isn't it awful." They declare that no other word was spoken by her during all the proceedings. Mrs. Ruppel then wrote decedent's name on the will and directly after it the sick woman made not one but two "X" marks. The attesting witnesses then signed. We have no other account of this scene. But there is a story by Mrs. Ruppel that an hour or so after the execution of the will, she saw Mrs. Hughes, clothed in a wrapper, eating at the table in the kitchen, which was on the same floor as the sick room. If this really occurred, it was a stupid bit of stage play. Hughes, as he himself testified, had carried her there and carried her back to her bed. What and how much she ate, we are not told; yet it was on this same day, shortly before and shortly after the execution of the will that Dr. Langton, Reverend Mr. Moore and Mrs. Beck found her physically helpless; stricken with paralysis and cerebral hemorrhage and incoherent in her speech, not even recognizing Mrs. Beck, her neighbor.

We think we need go no further with this discussion. The jury saw and heard the witnesses, sifted the truth

from the manifest falsehoods, and fully comprehended the sordid, pitiless and secret program by which the actual condition of the woman was sought to be concealed, until her children, whom she loved, had been by the terms of the will deprived of their rights and a scheming old man made her sole beneficiary.

We find nothing in the charge of the court to the jury to which objection need be made. It went into needed details and was fair throughout to both parties.

Judgment affirmed.